IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| ADRIAN GUILLE, | CV 14-00051-H-DLC-JTJ |
| Plaintiff, | |
| vs. | ORDER AND FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE |
| JOSH SWEENEY, TOM WOOD, CHRIS CONNELL, MYRON BEESON, SGT. ROBERT TURNER, JOSH KNIGHT, SAMUEL SHORT, JASON TRUDEAU, GARRETT KENT, DANIEL SEGOVIC AND LEROY KIRKEGARD, | |
| Defendants. | |

Plaintiff Adrian Guille, a state prisoner proceeding pro se and in forma pauperis, filed this civil rights action pursuant to 42 U.S.C. § 1983, alleging an excessive use of force in violation of the Eighth Amendment while incarcerated at Montana State Prison (MSP). Mr. Guille alleges that the Inner-Perimeter Security (IPS) Team Defendants utilized excessive force to remove him from his cell even though he was acting in compliance with their instructions and offered no resistance. He alleges the IPS Team, without provocation, repeatedly sprayed him with "gas agents," tased him three times, smashed his face on the floor of his cell

1

and held it down, forcing him to inhale water and glass from the cell floor, and moved him to another cell without the opportunity to rinse the chemical agents off of his body. (Amd. Cmplt., Doc. 32 at 8-11.) Mr. Guille alleges that Defendants Turner, Knight, and John Doe failed to intervene to prevent the use of force and Defendants Kirkegard, Beeson, Wood, and Conell failed to discipline and/or supervise the IPS Officers. (Amd. Cmplt., Doc. 32 at 14-15.)

Defendants have moved for summary judgment, arguing they did not violate Mr. Guille's rights under the Eighth Amendment and alternatively that they are entitled to qualified immunity. (Docs. 52, 57.) The undersigned finds that there is a genuine dispute as to many material facts regarding the use of force incident; therefore, the IPS Team Defendants' Motion for Summary Judgment (Doc. 53) should be denied. In light of this recommendation, outstanding discovery issues must be resolved regarding the supervisory liability claims brought against Defendants Leroy Kirkegard, Tom Wood, Chris Conell, and Myron Beeson. Therefore, the Court recommends that the Non-IPS Team Defendants' Motion for Summary Judgment (Doc. 57) be denied without prejudice and subject to renewal as to the supervisory liability claims but granted as to Defendants Robert Turner, Josh Knight, and John Doe Cage Control officer, as well as with regard to all official capacity claims.

# I.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a); *Washington Mutual Inc. v. U.S.*, 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed.R.Civ.P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the record not cited to by the parties, although it is not required to do so.  Fed.R.Civ.P. 56(c)(3); *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); *accord Simmons v. Navajo County, Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010).

A fact is material if it might affect the outcome of the suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A

dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A defendant does not bear the burden of proof at trial, and in moving for summary judgment, he need only prove an absence of evidence to support the plaintiff's case. *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If a defendant meets his initial burden, the burden then shifts to the plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp.*, 627 F.3d at 387 (*citing Celotex Corp.*, 477 U.S. at 323). This requires a plaintiff to "show more than the mere existence of a scintilla of evidence." *Id.* (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

However, in judging the evidence at the summary judgment stage, the Court may not make credibility determinations or weigh conflicting evidence. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted). The Court must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment. *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted). The Court must liberally construe Mr. Guille's filings

4

because he is a pro se prisoner. *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

By contemporaneous notices provided January 7, 2016 (Docs. 56, 60), Mr. Guille was advised of the requirements for opposing motions brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc ); *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

## II.   IPS TEAM DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A.  Legal Standards Governing Eighth Amendment Claims

"In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials, who may not . . . use excessive physical force against prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (*citing Hudson v. McMillian*, 503 U.S. 1 (1992)). "[W]henever prison officials stand accused of using excessive physical force in violation of the [Eighth Amendment], the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7 (*citing Whitley v. Albers*, 475 U.S. 312 (1986)).

When determining whether the force was excessive, the Court looks to the

"extent of the injury suffered by an inmate . . . the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.' " *Hudson*, 503 U.S. at 7 (*citing Whitley*, 475 U.S. at 321).

Excessive force cases often turn on credibility determinations, and the excessive force inquiry " 'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom.' " *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (*quoting Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)). Therefore, "summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Id.* The Ninth Circuit has "held repeatedly that the reasonableness of force used is ordinarily a question of fact for the jury." *Liston v. Cnty. of Riverside*, 20 F.3d 965, 976 n.10 (9th Cir. 1997) (citations omitted). So it is in this case.

**B. Statement of Facts**

**i. Video of Incident**

The parties' versions of the incident at issue differ. There is however, a video of the incident that shows the IPS team approaching Mr. Guille's cell. Mr. Guille is heard saying; "Hi," "how you doing," and "Good to see ya." He then

apparently comments on the IPS officers' face mask, saying "You are the umpire right? Strike." (Video, Doc. 52 at 3:04–3:16. )

One of the IPS officers puts his shield in front of the food tray slot as Sgt. Sweeney attempted to get the food tray slot open, which Mr. Guille had apparently jammed. The audio on the video is somewhat distorted, but it appears that Sgt. Sweeney instructed the officer to block the food tray slot so that Mr. Guille could not throw anything out of his cell. (Video, Doc. 52 at 3:11–3:15.)

After getting the food tray slot open, Sgt. Sweeney instructed Mr. Guille to "strip out and cuff up." (Video, Doc. 52 at 3:51.) Sgt. Sweeney testified that this instruction meant Mr. Guille was required to undress and put his hands through the food tray slot in his door to be cuffed. (IPS SUF, Doc. 55 at ¶ 30.) Mr. Guille replied with "huh?" and Sgt. Sweeney then again told Mr. Guille to "strip out." (Video, Doc. 52 at 3:44.) He repeated the instruction to "strip out" and cuff up at 4:00 on the video. Sgt. Sweeney then sprayed CS spray[1] in through the food tray slot at 4:04 on the video. At 4:15 on the video, Mr. Guille is heard saying: "Hey I just want you to know that I tried to cuff up and you sprayed me when I turned around." (Video, Doc. 52 at 4:15.) Sgt. Sweeney again stated "strip out, cuff up"

_____

[1] Orthocholorobensalmalononitrate spray. (Sweeney Declaration, Doc. 55-2 at 6, ¶ 40.)

7

at 4:21 and 4:24 and then sprayed CS spray through the food tray slot at 4:26.

During this second burst of CS spray, Mr. Guille yelled out that he had already

tried to cuff up. (Video, Doc. 52 at 4:26.) Mr. Guille then asked if they wanted

him to cuff up or not. (Video, Doc. 52 at 4:39)

Sgt. Sweeney instructed Mr. Guille to "strip out cuff up" again at 4:56. At

4:58, Mr. Guille asked, "What do you want me to do?" Sgt. Sweeney responded

"strip out, cuff up." (Video, Doc. 52 at 5:00.) At 5:07, Sgt. Sweeney banged on

the top of the cell to have it opened and the cell door was opened at 5:09. At 5:10,

one of Mr. Guille's hands can be seen sticking out of the cell door, face up. Sgt.

Sweeney then shoots Mr. Guille in the back with a taser; the officers entered the

cell, took Mr. Guille to the ground, and restrained him.

After he was extracted, Mr. Guille was taken to a chair in a hallway and seen

by a nurse. (Video, Doc. 52 at 7:55 -11:40.) He was then taken to a shower, rinsed

off, and placed in a new cell. (Video, Doc. 52 at 13:27 - 13:58.)

### ii. Mr. Guille's version of the facts

Mr. Guille contends that IPS Officer Josh Sweeney and four other IPS

personnel directed him to get dressed because he was going to A-block (the

"hole"). (MSJ Response Brief, Doc. 73-1 at 2.) Mr. Guille contends he began

getting dressed and asked to speak with Sgt. Turner, at which point Officer

8

Sweeney said: "I'm so sick of this guy" and left the block with the other IPS officers. (Response, Doc. 73-1 at 2.) Mr. Guille received word from other inmates that IPS was "suiting up." Mr. Guille became angry and "trashed" his cell; in the process he threw a vent cover and two socket covers through a window. He also engaged the fire sprinkler system and waited for the IPS officers to return. (Response, Doc. 73-1 at 2-3.)

When the IPS officers came back to his cell, Mr. Guille attempted to "cuff-up" by placing both hands behind his back and out through the cuff-port but a member of the IPS team pushed his hands back inside of the cell. (Response, Doc. 73-1 at 3.) Mr. Guille, not knowing what to do, took off some of his clothes to show he was not hiding weapons or anything else in them. He then, for a second time, placed his hands behind his back and put them through the cuff-port. This time, Mr. Guille felt gas agents being discharged all over his back, neck, and head. He pulled his hands back inside of the cell and said: "What do you want me to do?"

He then, for the third time, put both hands behind his back and backed them through the cuff-port, but his hands were again pushed back inside the cell by a member of the IPS team. He then stood up and said: "Fine, what do you want then?" IPS then opened the door very quickly and shot Mr. Guille in the back with

a taser, and he fell face down on the cell floor.  He then stated: "What do you want me to do?"  He was then tased again.  He said again, much louder: "What do you want me to do?"  At this point a member of the IPS team grabbed the hair on the back of Mr. Guille's head and slammed his face into the cell floor, creating a gash above his right eye roughly an inch and a half in length.  Mr. Guille alleges the officer held his face down into the water, forcing him to inhale water and glass from the cell floor.  Mr. Guille was then tased again.  Mr. Guille contends that during these events he did not resist or threaten the officers in any fashion.  (Amd. Cmplt., Doc. 32 at 9-10.)

Mr. Guille alleged that after the incident he was taken by IPS to a chair in the hallway where a nurse looked at his face from a distance of approximately three feet.  Mr. Guille stated he was experiencing a lot of facial pain from the gash above his eye and several other places and had swallowed glass.  The nurse said: "It looks like you'll live."  (Amd. Cmplt., Doc. 32 at 12.)

Mr. Guille alleged the IPS Officers then took him to A block and placed him in a cell, completely naked and without any blankets, sheets, or bed.  He alleged the water was turned off in the new cell and Mr. Guille was not allowed the

opportunity to rinse off the chemical agents.[2]  (Amd. Cmplt., Doc. 32 at 13.)

Mr. Guille alleged the IPS Team have repeatedly engaged in excessive force against inmates in the past.  He alleged Defendants Kirkegard, Wood, Beeson, and Conell had been placed on notice of the abusive conduct of the Defendants through multiple complaints and grievances over many months but failed to take disciplinary action against them or otherwise control their behavior.  (Amd. Cmplt., Doc. 32 at 14-15.)  He also alleges that the failure of Defendants Knight, Turner, and John Doe to intervene and prevent the use of force constitutes deliberate indifference to Mr. Guille's safety.  (Amd. Cmplt., Doc. 32 at 15.)

### iii.  Defendants' Version

In contrast, Sgt. Sweeney testified that while conducting random cell searches he told Mr. Guille that IPS was going to search his cell and told him to "strip out" (strip out of all his clothes so they could confirm he did not have a weapon) and "cuff up."  (IPS SUF, Doc. 55 at 7-9.)  Defendants contend that Mr. Guille refused to comply with Sgt. Sweeney's instruction to strip out and cuff up. The IPS Team then left the block to collect their protective gear.  (IPS SUF, Doc. 55 at ¶14, 16.)  They then returned to Mr. Guille's cell and saw that he had trashed

---

[2] The allegation that he was not allowed an opportunity to rinse off the chemical agents is not supported by the video, which shows the IPS officer rinsing Mr. Guille off in a shower prior to placing him in the new cell.  (Video, at 13:27–13:58.)

the cell, broke the back window to his cell, tore metal items and covers off the walls, broke the sprinkler off the ceiling, and started flushing concrete down his toilet. (IPS SUF, Doc. 55 at ¶ 19.) The broken sprinkler caused Mr. Guille's cell to flood. At that time, Defendants also noticed that Mr. Guille had wrapped his left hand in cloth and had a metal object, which appeared to be a weapon, in his hand. (IPS SUF, Doc. 55 at ¶ 21.) Mr. Guille had torn the metal object off of the wall or ceiling of his cell and had bent it into a point as a makeshift weapon. (IPS SUF, Doc. 55 at ¶ 22.) Mr. Guille postured and made profanity-laced threatening statements that caused the IPS Team to believe that he would use the weapon against them if they entered his cell. (IPS SUF, Doc. 55 at ¶ 23.) The IPS Team contacted Command Post to notify them of their intent to extract Mr. Guille from his cell. (IPS SUF, Doc. 55 at ¶ 24.) The IPS Team then proceeded to put on their protective gear and approached Mr. Guille's cell. (IPS SUF, Doc. 55 at ¶ 25, 28.)

Officer Segovia, who was not a member of the IPS team, recorded the incident with a video camera.

Defendants testified that Mr. Guille did not strip out completely and refused to remove his underwear. Because Defendants had seen Mr. Guille with a weapon, they felt it was necessary for Mr. Guille to fully strip. Defendants also contend that Mr. Guille refused to present his left hand, which was the one that Defendants

had seen the weapon in previously. Mr. Guille's action led Defendants to believe that Mr. Guille still possessed the weapon.

Defendants testified that as Mr. Guille's cell door was opening, Mr. Guille started walking backwards towards the door and presented his opened right hand. Defendants testified, however, that Mr. Guille kept his left hand in a closed fist and held it down by his left leg so they could not see if he had anything in his left hand. They therefore assumed that Mr. Guille still had a weapon. For the safety of Defendants, Sgt. Sweeney made the decision to deploy the Taser X-26, which impacted Mr. Guille in the right side of his back. The Taser incapacitated Mr. Guille and caused Mr. Guille to fall to the floor. Mr. Guille's incapacitation allowed Defendants to enter Mr. Guille's cell and gain control of Mr. Guille.

Officer Kent entered Mr. Guille's cell first and placed a shield on top of Mr. Guille to ensure that he could not stand up. Officer Trudeau entered Mr. Guille's cell and attempted to secure Mr. Guille's right arm. Officer Short entered Mr. Guille's cell and attempted to secure Mr. Guille's left arm. Mr. Guille struggled with Defendants as they attempted to gain control of his left arm. Defendants ordered Mr. Guille multiple times to give up his left arm so that they could determine if he was still carrying the weapon in his hand. In the course of trying to restrain Mr. Guille and get him to give up his left arm, Sgt. Sweeney administered

the Taser two more times. Eventually, Mr. Guille complied and gave up his left arm. Once Mr. Guille gave up his left arm and Defendants determined that he did not have a weapon in his hands, Sgt. Sweeney asked Mr. Guille where the weapon was. Mr. Guille responded by stating that he threw it out the window. Defendants contend that they did not smash Mr. Guille's face into the concrete floor as Mr. Guille alleges and did not hold his face down so that he inhaled water or glass. Once Mr. Guille was secured, Defendants removed his underwear to confirm that he was not hiding any weapons. Defendants placed a towel around Mr. Guille's waist and removed him from his cell. Defendants then escorted Mr. Guille to a hallway where he was assessed by medical staff. They then took him to a shower, rinsed him off, and placed him in a new cell.

### C. Excessive Use of Force

#### i. Injury Suffered by Mr. Guille

While de minimis uses of physical force generally do not implicate the Eighth Amendment, significant injury need not be evident in the context of an excessive force claim because "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson*, at 9 (*citing Whitley*, 475 U.S. at 327).

The extent of injury suffered by the plaintiff may indicate the amount of

force applied.  *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010).  "[N]ot 'every malevolent touch by a prison guard gives rise to a federal cause of action.' "  *Id.* (*quoting Hudson*, 503 U.S. at 9).  "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.  An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim.  Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts."  *Wilkins*, 559 U.S. at 37-38 (internal citations and some internal quotation marks omitted).

Mr. Guille contends that the officers repeatedly sprayed him with chemical agents, tased him three times, forced his head onto the floor, causing him to ingest glass and water, and banged his head on the floor, causing an inch and a half gash above his right eye.  Defendants argue that the injury sustained by Mr. Guille was "slight," but they acknowledge Mr. Guille suffered "initial pain" as a result of the taser and a small cut above his eye.  Defendants argue that the temporary and minimal injuries show that Defendants did not inflict malicious and sadistic force. (Doc. 61 at 17.)  Nevertheless, taking the facts in the light most favorable to Mr. Guille, this factor weighs in Mr. Guille's favor.

15

### ii. Need for Application of Force

Defendants argue that force was necessary because they had seen Mr. Guille with a makeshift weapon, they were unable to see both of his hands throughout this encounter, and therefore they were unable to verify whether he still had the weapon on his person. An inmate's refusal to comply with orders may present a threat to the safety and security of a prison. *Lewis v. Downey*, 581 F.3d 467, 476 (7th Cir. 2009); *Whitley*, 475 U.S. at 320-22; *Spain v. Procunier*, 600 F.2d 189, 195 (9th Cir. 1979). The problem with Defendants' argument, however, is that Mr. Guille contends that he complied with each of the officers' orders. If Mr. Guille's version of the facts is true, then no physical force was necessary or justified. Mr. Guille testified that he presented both hands, open-faced, in an attempt to cuff up as directed. If Mr. Guille was presenting his open-faced hands to the officers in an attempt to cuff up, Defendants should have been able to see that he did not have a weapon on him and there was no need for force.

Further, even if there was a need to chemical spray Mr. Guille three times and tase him three times, Mr. Guille alleges a member of the IPS team grabbed his hair and slammed his face into the cell floor, causing the gash on his face while he was fully compliant. There would have been no need to slam Mr. Guille's face against the floor of his cell as he alleges he was attempting to comply with the

16

officers.

Mr. Guille has presented sufficient evidence to create a genuine issue of material fact regarding the need for application of force.

### iii. Relationship Between Need for Force and Amount of Force Used

In determining whether there has been an Eighth Amendment violation, the standard is "malicious and sadistic force, not merely objectively unreasonable force." *Clement v. Gomez*, 298 F.3d 898, 903 (9th Cir. 2002); *Hudson*, 503 U.S. at 9 (not every malevolent touch gives rise to an Eighth Amendment claim). "The infliction of pain in the course of a prison security measure, therefore, does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Whitley*, 475 U.S. at 319.

With respect to the use of chemical spray, Mr. Guille testified he was complying with Sgt. Sweeney's orders to strip down and cuff up when Sgt. Sweeney sprayed him. Although there were multiple orders to "strip down cuff up," most of those orders were immediately followed by a burst of chemical spray. The video demonstrates that Sgt. Sweeney ordered Mr. Guille to strip down and cuff up at 4:00 and then fired a burst of CS spray on him at 4:03. Similarly, he gave his orders at 4:20 and 4:24 and then fired a burst of CS spray at 4:27.

According to Mr. Guille, he was attempting to comply with Sgt. Sweeney's orders by taking off his clothes and attempting to place both hands out of the food tray slot, but the officers pushed his hands back into the cell. This statement is supported by the video, which shows one of the IPS officers holding a shield up against the food tray slot to keep Mr. Guille from throwing anything outside the cell.

Defendants cannot justify the use of force saying Mr. Guille did not comply with their orders when according to Mr. Guille they physically prevented him from complying. Taking the facts in the light most favorable to Mr. Guille, there is no indication that any physical force was necessary because Mr. Guille was in the process of complying with Sgt. Sweeney's orders. This factor tips in Mr. Guille's favor.

### iv. Threat Perceived by Defendants

The fourth *Hudson* factor considers "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them." *Whitley*, 475 U.S. at 321. In weighing this factor, courts should be mindful that "in making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to

18

inmates and prison officials alike, in addition to the possible harms to inmates against whom force might be used." *Id.* at 320.

Defendants argue that Mr. Guille's history of violence played into their decision making process. Only Warden Kirkegard, who was not present during the incident, testified that prior to July 5, 2013, Mr. Guille "had a significant, violent history that undoubtedly played into the IPS Team's decision-making." (Kirkegard Declaration, Doc. 55-1 at 3, ¶ 11.) All of the IPS Team members testified that Mr. Guille had a violent history, but none of the officers present during the cell extraction testified that they were aware of Mr. Guille's disciplinary history prior to the incident on July 5, 2013. (See IPS Defendants' Declarations, Docs. 55-2 at ¶ 89, 55-3 at ¶ 78, 55-4 at ¶ 78, 55-5 at ¶ 78, and 55-6 at ¶ 63 ("Plaintiff had a significant violent history and was found guilty of possessing weapons on several prior occasions.").)

Nevertheless, it was not unreasonable to perceive a threat from Mr. Guille in light of Defendants' undisputed statements that they had previously seen Mr. Guille with a makeshift weapon and he had made threatening gestures. But again, if the Court takes the facts in the light most favorable to Mr. Guille, it would not have been reasonable to perceive a threat when Mr. Guille was attempting to cuff up by placing both hands behind his back and out through the cuff port and taking

his clothes off.

Because the Court must take the facts in the light most favorable to Mr. Guille, this factor also weighs in his favor.

### v.  Efforts Made to Temper Severity of Force

Whether Defendants attempted to temper the severity of the force used on Mr. Guille is entirely dependent on which version of the facts is believed.  In Mr. Guille's version of the facts, which must be taken as true for the purposes of summary judgment, Sgt. Sweeney used CS spray on Mr. Guille where no force was necessary because he was being fully compliant.  Mr. Guille's allegations that he was repeatedly sprayed with chemicals, tased three times, tackled by three officers, and had his head slammed against the floor of his cell while he was being completely compliant with the officers' instructions and not threatening the officers in any way suggests that the officers made no effort to temper the severity of the force and it was only used to cause him harm.  This factor tips in Mr. Guille's favor.

For these reasons, the Court finds material issues of fact as to whether Defendants' use of force against Mr. Guille was excessive and in violation of Mr. Guille's Eighth Amendment rights.

**D.  Qualified Immunity**

Government officials are immune from civil damages "unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Jeffers v. Gomez*, 267 F.3d 895, 910 (9th Cir. 2001) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  In analyzing a qualified immunity defense, the Court must consider the following: (1) whether the alleged facts, taken in the light most favorable to the plaintiff, demonstrate that defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue was clearly established at the time of the incident.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001) *overruled in part by Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (overruling *Saucier*'s requirement that the two prongs be decided sequentially).

The Court has found that, taken in the light most favorable to Mr. Guille, the allegations demonstrate a violation of Mr. Guille's Eighth Amendment rights. The first prong of the analysis is therefore resolved in Mr. Guille's favor.

With respect to whether there was a clearly established right, the law at the time of the use of force was clear that force used sadistically and maliciously for the very purpose of causing harm violated the Eighth Amendment.  *Whitley*, 475 U.S. at 320-21.  "[S]ummary judgment based on qualified immunity is improper if,

under the plaintiff's version of the facts, and in light of the clearly established law, a reasonable officer could not have believed his conduct was lawful." *Schwenk v. Hartford*, 204 F.3d 1187, 1196 (9th Cir. 2000) (*citing Grossman v. City of Portland*, 33 F.3d 1200, 1208 (9th Cir. 1994)). The disputed issues of fact surrounding the degree and type of force used in this case preclude a finding that Defendants are entitled to qualified immunity. Taking the facts in the light most favorable to Mr. Guille, he was being completely compliant, and therefore, there was no need for any force. It has long been established that "[f]orce is excessive when it is greater than reasonable under the circumstances," *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002), and that "where there is no need for force, any force used is constitutionally unreasonable." *Fontana v. Haskin*, 262 F.3d 871, 880 (9th Cir. 2001).

Because there are disputed issues of material fact, the IPS Defendants are not entitled to qualified immunity, and their motion for summary judgment should be denied.

## III.   NON-IPS DEFENDANTS MOTION FOR SUMMARY JUDGMENT

### A.  Warden Kirkegard

Warden Kirkegard argues that he is entitled to summary judgment because he has only been sued in his official capacity, and as such, all claims against him

are barred by the Eleventh Amendment. Official capacity claims are "in all respects other than name" suits against the government entity. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Accordingly, Mr. Guille's claims against Warden Kirkegard in his official capacity are in essence claims against the State of Montana.

The Eleventh Amendment bars suit in federal court against a state absent a valid abrogation of immunity by Congress or an express waiver of immunity by the State. *See Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267–268 (1997); *Edelman v. Jordan*, 415 U.S. 651, 653 (1974); *Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993). The State of Montana has waived immunity only for tort claims brought in state court. Mont. Code Ann. § 2-9-101 et seq. In addition, States, state agencies, and state officials sued officially are not "persons" subject to suit for money damages under section 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65, 71 (1989).

Warden Kirkegard, as named in his official capacity, has Eleventh Amendment immunity from suit in federal court and is not a "person" for purposes of 42 U.S.C. § 1983.

The Eleventh Amendment does not bar suits for prospective declaratory or injunctive relief against state officials in their official capacity. *See Idaho v. Couer*

*d'Alene Tribe*, 521 U.S. 261; *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102-106 (1984); *Doe v. Lawrence Livermore Nat'l Lab.*, 131 F.3d 836, 839 (9th Cir. 1997). Mr. Guille, however, does not seek prospective declaratory or injunctive relief against Warden Kirkegard. The official capacity claims against Warden Kirkegard should therefore be dismissed.

Although all claims against Warden Kirkegard in his official capacity are barred by the Eleventh Amendment, the Court's construes Mr. Guille's Amended Complaint as raising individual claims against Warden Kirkegard that are addressed below.

### B. Failure to Intervene

Prison officials have a duty to take reasonable steps to protect inmates from physical abuse. *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994) (quotations omitted); *Hearns v. Terhune*, 413 F.3d 1036, 1040 (9th Cir. 2005). "[A] prison official can violate a prisoner's Eighth Amendment rights by failing to intervene." *Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995). A prison official may be held liable under the Eighth Amendment "only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847.

Mr. Guille contends that Defendants Knight, Turner, and Officer John Doe

failed to intervene to prevent the misuse of force. (Amd. Cmplt., Doc. 32 at 15.) It is undisputed that Robert Turner was the sergeant assigned to the unit that Mr. Guille was on during the July 2013 cell extraction. (Non-IPS Defendants' Statement of Undisputed Facts ("Non-IPS SUF"), Doc. 59 at ¶ 56.) But is also undisputed that Mr. Turner had no responsibility over the IPS Team during the cell extraction (Non-IPS SUF, Doc. 59 at ¶ 61) and he could not see or hear Mr. Guille's cell extraction from where he was in the unit. (Non-IPS SUF, Doc. 59 at ¶ 63.)

Similarly, it is undisputed that Officer Josh Knight was working on the block where Mr. Guille was housed; however, during the cell extraction he was in an office where he could not see the cell extraction taking place, nor could he hear what was transpiring. (Non-IPS SUF, Doc. 59 at ¶ 71.)

Based on these undisputed facts, it is clear that neither Mr. Knight nor Mr. Turner were in a position to intervene in the cell extraction. No evidence has been presented that either of these Defendants knew Mr. Guille faced a substantial risk of serious harm and disregarded that risk. Mr. Guille's claims against Defendants Knight and Turner fail as a matter of law and should be dismissed.

Mr. Guille has not identified the John Doe Control Cage officer, no such officer has been served, and the deadline for amending his pleadings has long

passed.  The John Doe Control Cage Officer should also be dismissed.

### C. Supervisory Liability

Mr. Guille has alleged Defendants Kirkegard, Beeson, Wood, and Conell failed to supervise and/or take disciplinary action to curb a known pattern of physical abuse to inmates by Defendants Sweeney, Short, Trudeau, Kent and Segovic.[3]  He alleges this constituted deliberate indifference to Mr. Guille's safety and proximately caused a violation of his Eighth Amendment rights.  (Amd. Cmplt., Doc. 32 at 14-15.)

An individual can be held liable in their individual capacity under a theory of supervisory liability.  "[A] plaintiff may state a claim against a supervisor for deliberate indifference based upon the supervisor's knowledge of and acquiescence in unconstitutional conduct by his or her subordinates."  *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011).  Section 1983 will not impose liability on supervising officers under a respondeat superior theory of liability.  *Monell*, 436 U.S. at 691-94.  That is, a defendant cannot be held liable just because they supervise other

---

[3]  Defendants argue that all claims against Warden Kirkegard should be dismissed because he was only sued in his official capacity.  While technically correct, Mr. Guille's Amended Complaint must be construed liberally and he seems to intend to hold Warden Kirkegard liable for his personal actions as well.  Out of an abundance of caution, the Court will analyze the supervisory liability claims brought against Warden Kirkegard.

employees.  Instead, supervising officers can be held liable under § 1983 "only if they play an affirmative part in the alleged deprivation of constitutional rights." *King v. Atiyeh*, 814 F.2d 565, 568 (9th Cir. 1987).

The Ninth Circuit has identified four general situations in which supervisory liability may be imposed: (1) for setting in motion a series of acts by others, or knowingly refusing to terminate a series of acts by others, which they knew or reasonably should have known would cause others to inflict constitutional injury; (2) for culpable action or inaction in training, supervision, or control of subordinates; (3) for acquiescence in the constitutional deprivation by subordinates; or (4) for conduct that shows a reckless or callous indifference to the rights of others.  *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991).

But allegations against supervisors that resemble "bald" and "conclusory" allegations should be dismissed.  *Hydrick v. Hunter*, 669 F.3d 937 (9th Cir. 2012). Allegations that a supervisory defendant had personal knowledge of a constitutional violation will be insufficient without "specific allegations regarding each Defendant's purported knowledge" of the violation.  *Hydrick*, 669 F.3d at 942.  Therefore, Mr. Guille must provide "sufficient facts to plausibly establish the defendant's 'knowledge of' and 'acquiescence in' the unconstitutional conduct of his subordinates."  *Hydrick*, 669 F.3d at 942 (*citing Starr*, 652 F.3d at 1206–07).

"A defendant may be held liable as a supervisor under § 1983 if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). That is, to impose liability under section 1983 against a supervisor, a plaintiff must establish the supervisor's prior knowledge of unconstitutional conduct committed by subordinates that would give the supervisor notice of the need for changes. *Howell v. Earl*, 2014 WL 2594235 (D.Mont. 2014)(*citing Starr*, 652 F.3d at 1208; *Dougherty v. City of Covina*, 654 F.3d 892, 900–01 (9th Cir. 2011)); *see also Larez*, 946 F.2d 630, 646 (9th Cir. 1991), *Watkins v. City of Oakland*, 145 F.3d 1087, 1093–94 (9th Cir. 1997), and *Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007).

Therefore, if Defendants Kirkegard, Beeson, Wood, and Conell were on notice of the IPS Defendants' propensity to use excessive force and they failed to take action to remedy that issue, they could be held liable

Mr. Guille submitted document requests during the course of discovery, seeking prior grievances, complaints, or other documents received by Defendant Beeson or his agents concerning mistreatment of inmates by Defendant Sweeney and the IPS officers working with him on July 5, 2013, and any memoranda,

investigative files, or other documents created in response to such complaints since July 5, 2012, to the date Mr. Guille was transferred out of state. (Request for Production, Doc. 37-2 at 8-9.) The Court denied Mr. Guille's Motion to Compel (Doc. 36) but stated:

> Other inmates' grievances regarding use of force by the individual Defendants prior to July 5, 2013, however, may be vital to establishing supervisory liability. However, if Mr. Guille cannot establish a constitutional violation by an individual officer, then there is no basis for supervisory liability. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.") Should Mr. Guille survive summary judgment on the issue of individual liability the Court will revisit this issue.

(Doc. 51 at 5.)

In light of the recommendation that the IPS Defendants' motion for summary judgment be denied, the Court recommends that Defendants Kirkegard, Beeson, Wood, and Conell's motion for summary judgment be denied without prejudice and such to renewal pursuant to Rule 56(d) of the Federal Rules of Civil Procedure (if a nonmovant shows that it cannot present facts essential to justify its opposition, the Court may deny the motion for summary judgment).

The Court will allow Mr. Guille an opportunity to renew his motion to compel limited to the issue of grievances, complaints, or other documents received

by prison staff concerning the mistreatment of inmates by the IPS Defendants and any memoranda, investigative files, or other documents created in response to such complaints from July 5, 2012, to July 5, 2013.  Should Defendants raise "unduly burdensome" as a defense to the motion to compel, they must address whether there is a method by which MSP can search or categorize grievances as discussed in the Court's December 16, 2015 Order.  (Doc. 51 at 5, n.3.)  The Court is, however, inclined to order the production of these documents with the redaction of names and other confidential information of the inmates making and/or involved in the grievances.

## IV.    OBJECTION TO DENIAL OF ABILITY TO PURSUE DISCOVERY

On July 11, 2016, Mr. Guille filed a document entitled "Plaintiff's Objection to the Denial of his Ability to Pursue Discovery and Notice of 'Good Cause' for Failing to Object Timely."  (Doc. 69.)  The docket lists this filing as a motion for reconsideration, but on further review, it does not appear that Mr. Guille seeks any particular relief in the filing.  He seems to be providing a litany of issues he has regarding his access to the courts, but he is currently housed in the Oregon Department of Corrections, an entity that is not a party to this lawsuit.  The objection itself seeks no specific relief and will therefore be denied.

## V. MOTION FOR APPOINTMENT OF COUNSEL

Mr. Guille has also filed a third motion for appointment of counsel. (Doc. 71; *see also* Doc. 6 motion filed 9/2/14; Doc. 42 motion filed 11/17/15.) Mr. Guille's prior motions for appointment of counsel were denied. In his latest motion, he again indicates he is unable to afford counsel, the issues are complex, he is a segregation inmate with limited access to the library, he has a limited knowledge of the law, he has been moved from Montana to Oregon and does not have access to Montana law, he has experienced a number of inter-institution relocations, he will be held in disciplinary segregation until he is transferred to another state, he has been denied a fair opportunity to pursue discovery, he anticipates problems with mail service, if transferred he may have difficulty maintaining his legal papers, and he wants to conduct additional discovery. (Doc. 71.)

The United States Supreme Court has ruled that district courts lack authority to require counsel to represent indigent prisoners in § 1983 cases. *Mallard v. United States Dist. Court*, 490 U.S. 296, 298 (1989). In certain exceptional circumstances, the district court may request the voluntary assistance of counsel pursuant to 28 U.S.C. § 1915(e)(1). *Terrell v. Brewer*, 935 F.2d 1015, 1017 (9th Cir. 1991); *Wood v. Housewright*, 900 F.2d 1332, 1335-36 (9th Cir. 1990). The

test for exceptional circumstances requires the Court to evaluate the plaintiff's likelihood of success on the merits and the ability of the plaintiff to articulate his claims pro se in light of the complexity of the legal issues involved. *Wilborn v. Escalderon*, 789 F.2d 1328, 1331 (9th Cir. 1986); *Weygandt v. Look*, 718 F.2d 952, 954 (9th Cir. 1983); *Palmer v. Valdez*, 560 F.3d 965, 970 (9th Cir. 2009). Circumstances common to most prisoners, such as lack of legal education and limited law library access, do not establish exceptional circumstances that would warrant a request for voluntary assistance of counsel. *Palmer*, 560 F.3d at 970.

Mr. Guille has failed to demonstrate the required exceptional circumstances at this time. His excessive force claim is not particularly complex, and he has thus far been able to articulate his claims pro se. The difficulties he lists are circumstances common to most prisoners and do not warrant appointment of counsel. Therefore, Mr. Guille's third request for appointment of counsel will be denied.

Based upon the foregoing, the Court issues the following:

## ORDER

1. Mr. Guille's Objection to the Denial of his Ability to Pursue Discovery and Notice of "Good Cause" for Failing to Object Timely (Doc. 69), to the extent it has been construed as a motion for reconsideration, is **DENIED**.

2.  Mr. Guille's Third Motion for the Appointment of Counsel (Doc. 71) is

**DENIED**.

3.  Mr. Guille may renew his motion to compel as set forth herein, but any

such motion must be filed on or before September 30, 2016.

Further, the Court issues the following:

## RECOMMENDATIONS

1.  The IPS Team Defendants' Motion for Summary Judgment (Doc. 53)

should be **DENIED**.

2.  The Non-IPS Team Defendants' Motion for Summary Judgment (Doc.

57) should be **DENIED WITHOUT PREJUDICE AND SUBJECT TO**

**RENEWAL** as to the supervisory liability claims brought against Defendants

Leroy Kirkegard, Tom Wood, Chris Conell, and Myron Beeson.  The motion

should be **GRANTED** as to Defendants Robert Turner, Josh Knight, John Doe

Cage Control officer, and with regard to all official capacity claims.  Defendants

Turner, Knight, and the John Doe Cage Control officer and all official capacity

claims against all defendants should be **DISMISSED**.

### NOTICE OF RIGHT TO OBJECT TO FINDINGS &
### RECOMMENDATIONS AND CONSEQUENCES OF FAILURE TO OBJECT

The parties may file objections to these Findings and Recommendations

within fourteen (14) days after service (mailing) hereof.[4]  28 U.S.C. § 636.  Failure

to timely file written objections may bar a de novo determination by the district

judge and/or waive the right to appeal.

This order is not immediately appealable to the Ninth Circuit Court of

Appeals.  Any notice of appeal pursuant to Fed.R.App.P. 4(a) should not be filed

until entry of the District Court's final judgment.

DATED this 19th day of August, 2016.

/s/ John Johnston
John Johnston
United States Magistrate

---

[4] As this deadline allows a party to act after the Findings and Recommendations
is "served," it falls under Fed.R.Civ.P. 6(d).  Therefore, three (3) days are added after
the period would otherwise expire.